**CITY OF NEW ORLEANS, By and Through the PUBLIC BELT RAIL-ROAD COMMISSION, for the City of New Orleans**

v.

**HANSEN & TIDEMANN, INC.***

Civ. A. Nos. 67–639, 67–1526, 67–1537, 67–1538, 67–1539, 67–1554, 67–1555, 67–1564, 67–1565, 67–1573, 67–1574, 67–1575 and 67–1589.

United States District Court,
E. D. Louisiana.

Dec. 21, 1972.

Supplemental Opinion Dec. 29, 1972.

---

* In each of which the Commission was Plaintiff and the following were Defendants; E. S. Binnings, Inc., 67–1526; Kerr Steamship Co., Inc., 67–1537; Gulf & South American Steamship Co., Inc., 67–1538; Dalton Steamship Corp., 67–1539; Gulf Coast Shipping Corp., 67–1554; West Coast Line, Inc., 67–1555; Funch, Edye & Co., Inc., 67–1564; Biehl & Co., 67–1565; Lykes Bros. Steamship Co., Inc., 67–1573; Amerind Shipping Corp., 67–1574; Smith & Johnson, Inc., 67–1575; Strachan Shipping Co., 67–1589.

Donald P. Endom, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiffs.

Edward S. Bagley, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for defendants.

BOYLE, District Judge:

Plaintiff, New Orleans Public Belt Railroad, sued defendants, various steamship lines, for demurrage accruing on railroad cars which had been placed on plaintiff's line. On a record stipulated to be comprised of a stipulation of facts, exhibits attached to the complaints and amended complaints, and the depositions and affidavits of A. J. Rafferty and John T. Hunter, there have been presented for adjudication two issues:[1] (1) plaintiff's right to demurrage under provisions of the average agreement between plaintiff and defendants and (2) plaintiff's right to demurrage outside of the coverage of the average agreement under Rule 9 of its tariff.

The matter was submitted on written memoranda and we took time to consider.

"The problems which gave rise to the present litigation came into being during the time preceding the longshoremen's strike during January, 1965. For many years plaintiff's tariff contained (and still contains) a provision which allows two days' 'free time' after actual or constructive placement by plaintiff of a railroad car containing export freight during which time demurrage would not accrue. Commencing on February 1, 1964 the Interstate Commerce Commission began the promulgation of a series of Service Orders which severely restricted the free time allowed on cars containing export freight. The first of these orders, Service Order 953, allowed a combined total of seven days' free time during the entire rail handling. Thus, if a shipper dispatched his shipment from the interior at an unduly early time so that it arrived at the port a week or more in advance of the arrival of the vessel aboard which its cargo was scheduled to be exported, the entire allowable free time would be exhausted while the car was being held by the line-haul rail carrier and prior to its delivery to the plaintiff. With the congestion before, during and after the longshoremen's strike of January, 1965, the number of rail cars fitting into this category became quite large and by this litigation the plaintiff seeks to tax the demurrage charges for these cars against the steamship lines aboard which the cargo ultimately was transported. Subsequent developments have included the enactment by the Interstate Commerce Commission of Service Orders 976 and 979 during 1966 which served to further reduce the free time allowed on export cars to five days. The Service Orders have the further effect of eliminating certain classifications of freight cars entitled to treatment under average agreements such as that provided in Rule 10 of plaintiff's tariff. Railroad cars containing export freight are subject to demurrage charges by the inbound rail carrier while the cars are held by it in New Orleans prior to their being received by plaintiff at the inbound rail carrier's interchange with plaintiff."

(See Stipulation and Submission, pp. 6–7).

All the cars involved in this case contained cargo shipped at a shipside rate, under which it was the duty of the line-haul carrier to deliver the cars to the wharf and unload the cargo to the public wharves in the Port of New Orleans as-

---

1. In all cases except Nos. 67–1555 and 67–1574.

signed to defendants, at which time and place the defendants accepted delivery of the cargo for loading aboard vessels.[2]

Rule 9 of plaintiff's tariff provides:

"Cars containing export, coastwise or intercoastal freight for movement to wharves served by the NOPB RR will be accepted from connecting carriers only when orders released to the inbound line-haul carrier for placement of such cars for unloading contain the 'O.K.' of the steamship line for which the cars are intended. Exact copies of such orders must be furnished to the NOPB RR, this carrier reserving the right to regulate the receipt and movement of the cars to the wharves for the purpose of preventing accumulations and car delays."

The stipulation of the parties indicates that the copy of the car placement order with the steamship line "O.K. for Delivery" notation thereon, was to be delivered to the line-haul carrier by the shipper/consignee or its forwarder.

The stipulation indicates also that plaintiff did not expressly waive the tariff requirement that it receive a copy of the order. Significantly, the tariff does not designate who had the obligation to furnish plaintiff with "exact copies of such orders". We find no means by which the tariff can be interpreted as placing the obligation on the steamship line to furnish such copies to plaintiff. The defendants' contention that the tariff does not so place that obligation on them, but rather on "the line-haul rail

carriers and/or the shippers/consignees and/or their agents" finds support in the stipulation statement that

"At no time did plaintiff communicate to any of the defendants a waiver of the requirement under Rule 9 of its tariff that an executed copy of the placement order—with the steamship lines' 'O.K. for Delivery' notation, as delivered to inbound line-haul carriers by the shipper/consignee or its forwarder—be sent to the plaintiff."

(See Stipulation and Submission, p. 10).

However, regardless of whose obligation it was, the practice developed over a number of years prior to accrual of the claimed demurrage, and was indulged in by plaintiff, (apparently because it did not interfere with its internal operations) that plaintiff would not be provided with the information, and plaintiff did not insist upon compliance with the tariff requirement with respect thereto. Stipulation and Submission, pp. 5, 10.

The line-haul rail carrier upon its receipt of the placement order would place on the car a tag, showing the name of the vessel and the wharf to which the car, then located in an interchange yard to which plaintiff had access, was to be sent. The plaintiff, accepting the implied representation that the line-haul carrier had received a placement order stamped with an "O.K. for Delivery" and without further documentation (than the tag), would move the car on its tracks to the designated wharf.

2. The following is a description of the manner in which export traffic passes through the port of New Orleans. An inland shipper desiring to move cargo to a foreign country will contact or cause to be contacted steamship lines to determine on what dates a ship destined for the port which the cargo is intended will leave the port of New Orleans. It then causes a line-haul rail carrier (e. g. Illinois Central, Southern Pacific, etc.) to move the cargo to New Orleans in time to get to wharfside prior to the date of the expected departure of the vessel. Upon arrival in the New Orleans metropolitan area the railroad cars are placed in "interchange yards" to which the plaintiff has access.

Stipulation and Submission, p. 3.

It is the practice of the plaintiff to place rail cars for unloading by the line-haul rail carriers on its tracks on the land side of the various individual berths in accordance with the assignment of such berth by the Dock Board, i. e., if Berth No. 1 is assigned to Vessel A, rail cars containing cargo destined to be loaded aboard Vessel A will be placed by plaintiff on its track on the land side of Berth No. 1 to facilitate the operation of the line-haul rail carriers in unloading the cargo to a place of rest at that berth and wharf.

Stipulation and Submission, pp. 4–5.

In giving to the shipper/consignee the "O.K. for Delivery" form, the defendants would place thereon one of two types of stamps, both of which evidenced the defendants' refusal to be responsible for demurrage.

Plaintiff claims to be entitled to demurrage under Rules 9 and 10-A of its tariff. Rule 9 states the requirement that the rail carrier obtain an "O.K." from the steamship line and that the steamship line assumes responsibility for demurrage by giving the "O.K." Rule 10-A is an average agreement entered into by plaintiff and defendants providing for the computation of demurrage. The Interstate Commerce Commission Service Orders (953, 976 and 979) had the effect of reducing free time on export cars and of eliminating cars entitled to the average agreement treatment and plaintiff thereafter billed defendants for demurrage under Rule 9.

Defendants have paid all demurrage which in their opinion was caused by their fault. Plaintiff, however, does not rely on any fault of the defendants as establishing their right to recovery. Rather, plaintiff contends it can recover from defendants even if the delay was caused by a shipper or line-haul rail carrier. At all events, plaintiff reserves the right to show that some of the delays were caused by the fault of the defendants.

"Demurrage can accrue on export cars being handled by the Public Belt for any one or more of the following reasons, among others:

(a) Delay of inbound rail carrier or its contractor to unload shipment;

(b) Delay in vessel arriving at port;

(c) Election of steamship line or agent to designate different order of unloading railroad cars than that initially contemplated;

(d) Freight forwarder's failure to make timely delivery to inbound rail carrier of steamship line's O. K.;

(e) Inbound rail carrier's failure to release car to plaintiff for its timely arrival at steamship line's preferential dock space;

(f) Shipper (consignor) making rail shipment too far in advance of intended vessel's scheduled arrival at the port;

(g) Shipper (consignor) making rail shipment too late to accomplish delivery prior to intended vessel's departure from the port and holding cargo for next available vessel;

(h) Congestion in yard of inbound rail carrier preventing prompt delivery of rail cars to plaintiff;

(i) Congestion on plaintiff's tracks causing delay in delivery by plaintiff to the tracks alongside the assigned berths;

(j) Unavailability of wharf space for export cargo.

As a consequence of the strike and the increased traffic prior to the strike in anticipation of it, both before and after the strike there was disruption of the steamship schedules, congestion in the rail yards of the line-haul carriers and of the plaintiff and on the tracks adjoining defendants' preferential wharf space, insufficiency of the line-haul rail carriers' labor to expedite car loading and unloading and insufficiency of equipment and facilities on the part of the plaintiff and of the line-haul rail carriers to expedite handling of cars to and from the wharves. The entire port facilities accordingly were taxed beyond their capacity and the fact that export and import cargo fully occupied the wharves in many instances precluded the placement of further export cargo thereon until it could be moved out by the steamship carriers as to export cargo or by the line-haul rail carriers as to import cargo. Similarly substantial delays were experienced by defendants through the inability of inbound and outbound rail

carriers to provide sufficient labor for the loading and unloading which were urgently required both for import and export cargo. Accordingly, plaintiff was unable to move the cars to and from the docks at the frequency at which they could have been moved under normal circumstances. Prior to and after the strike, cargo accommodated on the wharves was, under the tariffs of the Board of Commissioners for the Port of New Orleans ("Dock Board"), entitled to seven days' free time (ten days prior to January, 1966). The Dock Board published tariff amendments which exempted from demurrage all inbound and outbound cargoes assembled on the wharves, through the time of the strike, with the exception of those cargoes which were already on demurrage at the commencement of the strike."

(See Stipulation and Submission, pp. 8–9).

It was further stipulated that since the time above referred to, plaintiff has revised its practice and now collects demurrage from the shipper or consignee, neither of which the defendants, as to the cars involved here, were.

The resolution of the issues will depend on the interpretation of the two tariff Rules 9 and 10-A. Therefore, it is appropriate to discuss these provisions separately.

### RULE 10-A DEMURRAGE

Rule 10-A provides an "average agreement" for computing the amount of demurrage. By means of this agreement a party thereto is given a credit for cars which are unloaded earlier. This credit can then be deducted from any debits which have resulted from delays in unloading and that pays for the net number of debits.

Plaintiff contends that by entering this agreement the defendant contracted to pay for all demurrage which accrued on cars containing cargo intended for their vessels. Defendants, however, argue that they are responsible only for cars which were actually consigned to them, not ones which merely contained cargo for their vessels. The pertinent part of the tariff rule states that:

"(I or we) do expressly agree to and with the New Orleans Public Belt Railroad that with respect to all cars which may, during the continuance of this agreement, be handled *for (my or our) account* on tracks of the New Orleans Public Belt Railroad (I or we) will fully observe and comply with all the terms and conditions of said rules as they are now published, or may hereafter be lawfully modified by duly published tariffs, and will make prompt payment of all demurrage charges accruing thereunder in accordance with the average basis . . ." (emphasis added).

The problem, therefore, is one of determining which cars the parties intended the agreement to cover. The rule in interpreting a tariff has been said to be:

"The construction of a printed railroad tariff presents a question of law and does not differ in character from that presented when the construction of any other document is in dispute. The four corners of the instrument must be visualized and all the pertinent provisions considered together, giving effect so far as possible to every word, clause, and sentence therein contained. The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed, and any ambiguity or reasonable doubt as to their meaning must be resolved against the carriers. But claimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in the light of the ordinary meaning of the words used and not a mere arguable basis." United States v. Missouri-Kansas-Texas Railroad Co., 194 F.2d 777, 778–779 (5th Cir. 1952).

Defendants point to the phrase "for our account" and conclude that this applies to the obligation to comply with all terms and also to the obligation to make prompt payment. Thus they reason they must pay demurrage only for cars actually consigned to them. Plaintiff refers us to the case of Southern Pacific v. Grangers' Business Association, 115 Cal.App. 256, 1 P.2d 477 (1931) which construed a similar provision. The court there considered the phrase "for our account" to refer only to the duty to observe all rules and so the promise to make prompt payment applied to all cars regardless of for whom they were handled. Defendants point to two factors present in that case to distinguish it. First, the business of defendant there consisted entirely of handling the cars consigned to others and so unless the clause was interpreted to include cars consigned to others, it could have no meaning. In our case, however, defendants do occasionally have cars consigned to them and defendants contend that only these cars are covered by the agreement. Plaintiff argues that the instances of cars being actually consigned to defendants are too rare for this to have been the intent. The parties have not specified any definite number of cars which were actually consigned to the defendants, apparently since defendants never denied that they were liable for any cars consigned to them. The two depositions submitted provide no exact number either, but do indicate that there were such instances. Despite the fact that cars were not regularly consigned to defendants, that does not render the agreement ineffective since the agreement was used to cover these cars. Defendants' second distinction is that in *Grangers'* defendant performed all of the unloading whereas defendants here received the cargo at the wharf, it being the duty of the rail carrier to unload the cars. Definitely the facts in the *Gran-*

*gers'* case are distinguishable and therefore the interpretation rendered there of "for our account" is not persuasive here. "For our account" would seem to us to refer to cars actually handled for the defendants as consignees rather than to cars which were merely used to deliver cargo to defendants' vessels by other parties.

Plaintiff points to the fact that at least one defendant paid demurrage bills arising on cars which were not consigned to the defendants. Apparently in some instances in which shippers were at fault, defendants paid the demurrage bills and then obtained reimbursement from those shippers. When the bills causing this litigation arose, defendants asserted that they should pay only those demurrage bills which were the result of their fault. If the tariff provisions reach the defendants as to cars not consigned to them, they can be held even if they were not at fault and hence the issue of fault is unimportant.[3] Houston Belt & Terminal Railroad v. Connell Rice & Sugar Co., 411 F.2d 1220 (5th Cir. 1969); Port Terminal Railroad Association v. Connell Rice & Sugar Co., 387 F.2d 355 (5th Cir. 1967). Plaintiff's argument is that defendants in paying these earlier bills took advantage of the average agreement and cannot now be heard to disavow the effect of the agreement. However, the record does not reveal that there was any such widespread action by the defendants as to constitute any form of estoppel.

Also bearing on this question is Section G of the average agreement which provides:

"An average agreement must include all cars loaded or unloaded on this Railroad, except that when desired separate agreements may be entered into for each plant or yard on this Railroad, but in no case can the cars loaded or unloaded by more than

---

3. Of course, plaintiff could not and does not assert a right to demurrage where the delay was caused by its improper placement of a car or some other act which was its own fault. The stipulation submitted assumes that such placement was properly made by the plaintiff.

one consignor or consignee be combined in one average agreement, except that cars consigned, reconsigned, or ordered to a public elevator, warehouse, or cotton compress serving various parties may be combined in one average agreement."

Defendants assert that Section G bars the use of the agreement because the cars were unloaded by more than one consignee, that is by various railroads acting as agents for the consignees. However, as plaintiff points out, the average agreement may still be used where the cars are "ordered to a public elevator, warehouse, or cotton compress serving various parties" despite the fact that unloading is done by more than one consignee. The parties by their stipulation have agreed that the wharves to which the cars were ordered were public. Nevertheless, the list of "public elevator, warehouse, or cotton compress" appears to be an exclusive listing, not merely illustrative. Further, if the exception was extended to include the wharves, the whole section would be meaningless since the exception would cover virtually everything except a private elevator, warehouse, cotton compress, or wharf. As stated above, any reasonable doubt must be construed against the plaintiff.[4] If plaintiff had intended that the wharves be included, it would have been a simple matter to insert that in the section. Since plaintiff failed to do this, we must conclude that wharves are not included within the exception. The unloading of the cars was done by the line-haul rail carriers or by contractors hired by them. We agree with defendants that the rail carriers were unloading the cars pursuant to their contract of transportation and in that sense they were unloading for the consignees. Therefore, under that interpretation, the cars unloaded by the rail carriers cannot be considered as being covered by the average agreement.

Plaintiff concedes in its memorandum that the usual arrangement is for demurrage to be paid by the consignor or consignee of the shipment, but contends that one of the exceptions to this rule is where there has been a contractual assumption. In view of the fact that this is the usual arrangement, any contractual assumption of liability for demurrage would have to be clearly expressed. The stipulation lists some ten possible reasons for demurrage accruing. Of these, defendants could be responsible for two, either a delay in their vessel arriving or a change in the designation of the order of unloading cars. Other reasons include delay of the rail carrier in unloading, failure of rail carrier to release cars to plaintiff timely, shipper making rail shipment too far in advance of vessel's arrival, shipper making rail shipment too late so as to miss the vessel, and others. Thus there are many possible causes of delay which are beyond the control of defendants and so it does not seem reasonable that they would assume liability for demurrage of all cars containing cargo for their vessels.

■ On the "O.K. for Delivery" placement orders the defendants stamped legends which declared that they were not responsible for demurrage accruing. It is defendants' contention that by this rubber-stamped disavowal they have relieved themselves of any liability for demurrage. This contention is without merit because the average agreement provides that it will remain effective until terminated by written notice from either party. The legend does not constitute written notice and thus has no effect as to any cars covered by the average agreement.

We conclude that the parties intended that the average agreement, which the defendants signed, cover only those cars actually consigned to the defendants and not all cars containing cargo destined for vessels of the defendants. In so holding, we construe "handled for our account" to mean just what it says, those cars actually consigned to the de-

4. United States v. Missouri-Kansas-Texas Railroad Co., *supra*.

fendants. Although defendants in some instances did pay demurrage on cars other than those actually consigned to them, we do not believe this evidenced an understanding on their part that they were liable for all demurrage. Apparently, they were reimbursed by shippers for delays caused by the fault of the shippers. The deposition of Andrew Rafferty, vice-president of one of the defendants, indicated that this was done rather than have the plaintiff collect it directly from the shipper so as not to antagonize the shippers. What payments the defendants made indicated more a concession to good business relations rather than an understanding of their liability. In addition, our reading of Section G of the average agreement negates the contention that the agreement covered all cars containing cargo destined for defendants' vessels. Nor has plaintiff given sufficient reasons why the defendants would assume a liability for demurrage which normally falls on consignees. Finally, the stipulation reflects the fact that since defendants' refusal to pay, the plaintiff has revised its practice and now collects demurrage bills from the shipper or consignee of the rail car or its agent. While the reason for this change does not appear, it certainly does indicate an understanding on the part of plaintiff that the shippers or consignees should be the ones to pay the expense of demurrage.

## RULE 9 DEMURRAGE

■ Plaintiff asserts that defendants are liable for demurrage under Rule 9 which provides that the "O.K." issued by the steamship lines is accepted by the plaintiff only on the condition that the steamship line "thereby signifies its guarantee to assume full responsibility for any demurrage which may accrue against the cars covered by the order and steamship 'O.K.'" In view of the fact that ordinarily consignees, not parties in defendants' position, are liable for demurrage,[5] it seems the defendants could be held liable only under such a clause. Hence it is the validity and effect of that clause which govern.

At the outset defendants cite us to Responsibility for Payment of Detention Charges, Eastern Central States, 335 I. C.C. 537 (1969) which held tariff provisions invalid to the extent that they attempted to place liability for detention charges upon a person not a party to the contract of transportation, stating at page 541:

"[m]otor carriers seek approval of tariff provisions which would impose liability for detention charges on persons who are not beneficial owners of the freight, who are not named as consignors or consignees in the bills of lading, and who are not otherwise party to the contract of transportation, e.g. a warehouseman who receives the freight pursuant to an 'in care of' designation."

At page 542:

"[s]uch provisions are unlawful to the extent that they attempt to place liability for detention charges upon a person not a party to the contract of transportation."

Plaintiff seeks to distinguish the situation here from that case by pointing out that liability incurred there was entirely involuntary, whereas here there was a volitional aspect, defendants' issuing an "O.K." Plaintiff concedes that the case of Central R. Co. of New Jersey v. Anchor Line, 219 F. 716 (2nd Cir. 1914) involves a similar situation in which the court held a carrier could not impose liability for demurrage on a steamship line by inserting a charge in their tariff, but plaintiff again asserts that that case lacks the volitional aspect which is present here. In contending that defendants were not bound to give this "O. K." plaintiff ignores its own Rule 9 which states that plaintiff will accept cars containing freight only when the

5. Pennsylvania Railroad Co. v. Moore-McCormack Lines, Inc., 370 F.2d 430, 432 (2nd Cir. 1966).

defendants have given their "O.K." Thus in order for defendants to ever have cargo unloaded beside their vessels, they must give this "O.K." to the rail carrier. This action can hardly be called voluntary in the sense in which plaintiff wishes it to be construed, such as a voluntary acceptance of liability for demurrage. Hence, the decision by the Interstate Commerce Commission and the case cited give great weight to defendants' argument that the tariff cannot impose liability on defendants. Defendants were not parties to the contract of transportation. They gave notice by an "O.K." that they would receive the cargo and they then received the cargo beside their vessel after the rail carrier had unloaded it. Plaintiff's Rule 9 also states that by the "O.K." the steamship line indicates it will "unload or have unloaded" the car. If plaintiff's argument as to demurrage were followed, then plaintiff could argue that the defendants were bound to load or unload the cars. However, it has already been stipulated that it was the duty of the rail carriers, not the defendants, to unload the cars. Based on this reasoning, defendants cannot be held liable under Rule 9.

Plaintiff has cited us to three cases involving through export bills which plaintiff claims show the reasonableness of charging demurrage to the steamship line.[6] However, we find those cases inapposite. In those cases the cargoes involved were covered by through export bills of lading, i.e. bills issued for carriage of the cargo from point of origin to and through the port of exit to the foreign delivery destination. A single contract of carriage at a through rate is involved placing the burden on the steamship of fixing the time at which a shipment shall be made from the interior point and to properly so time commencement of movement of the goods from the interior point so as to coordinate arrival with movement of the vessel in order to obviate delay at the port of exit. In the instant cases we are dealing with cargo which moved on a shipside rate with the line-haul rail carrier having the obligations to deliver the rail cars to the wharf where the vessel is to dock and to unload the cargo onto the docks where the ocean carrier accepts it and issues its bill of lading for carriage of the cargo thus and then coming into its control and custody. These circumstances do not make it reasonable to impose liability on the defendants for demurrage.

A final argument is made by defendants that any agreement to pay demurrage would constitute a rebate as prohibited by 46 U.S.C. § 817(b)(3). As defendants merely quoted the language of the statute and cited no authority that such action would be a rebate, they apparently do not urge this point strongly. Any agreement to pay demurrage would lack the discriminatory aspect characteristic of a rebate as defined in 13 C.J.S. Carriers § 379, at 851. Further, plaintiff has cited us to an arbitration proceeding, Arbitration Between E. M. Bliss Company v. American Export Lines, Inc., 1964 A.M.C. 762, in which the arbitrator required the steamship line to pay to the shipper 50% of the demurrage accrued with no hint that such payment would be a rebate. Hence, defendants' assertion of a demurrage payment being a rebate has no basis.

We therefore conclude that plaintiff cannot recover any demurrage bills from defendants under Rule 9 or Rule 10A of the tariff.

## SUPPLEMENTAL OPINION

After having decided the issues submitted for adjudication, as reflected in our opinion dated December 21, 1972, we called counsel for the parties into conference on December 18, 1972 to discuss disposition of remaining issues in this

---

6. Demurrage on Export Traffic at Louisiana Ports, 190 I.C.C. 704 (1933); Anderson-Tully Company v. Morgan's Louisiana & Texas Railroad and Steamship Company, 30 I.C.C. 140 (1914); Galveston Commercial Association v. Atchison, Topeka & Santa Fe Railway Company, 25 I.C.C. 216 (1912).

cause as reflected by the following appearing in the Stipulation and Submission filed herein (See Record Document No. 22):

The following questions as to law and fact are reserved by the parties hereto for later determination by the Court or by a commissioner appointed by the Court:

(a) The liability of those defendants which acted as agents for steamship lines on delivery of the cars subject to this litigation.

(b) The liability of any defendant as a result of the execution by a predecessor corporation of an average agreement with plaintiff.

(c) Any switching charges for which recovery is sought.

(d) Any question as to whether or not some of the charges claimed are time barred.

(e) Exculpation of liability of any defendant by virtue of compliance with the strike relief provision of plaintiff's tariff.

(f) Any demurrage arising out of import movements.

(g) (1) Any questions as to the actual amount of demurrage due, if any, or if the individual railroad cars involved under the circumstances pertaining to each such car within the framework and decision rendered by this Court, or by an appellate court should an appeal supervene, on the issues hereinabove submitted for decision. (2) Any question as to the liability of defendants in instances in which any one of them may have, in fact, been the consignee or consignor of the shipment as to which demurrage arose.

(h) Any question as to the liability of defendant for demurrage in instances involving the failure to stamp on a car order a notation, stating, to the effect, that such defendant would not be responsible for demurrage.

(i) The liability of any surety for defendants' obligations under any average agreements.

Counsel for the parties informed the Court that the aforesaid reservations were made by counsel for plaintiff and agreed that the Court's aforesaid opinion was dispositive of the questions identified above as (a), (b), (e), (g)(1), (h) and (i).

The Court has now been advised by counsel for the parties that the issues suggested by (c), (d), (f) and (g)(2) are no longer in the case.

Accordingly, the Court's aforesaid Opinion and this Supplemental Opinion is dispositive of all issues in these causes.

The Court has also been advised by counsel that the defendants in C.A. Nos. 67–1555 and 67–1574 are defunct and that the Stipulation and Submission did not include the aforesaid cases because counsel for said defendants (also counsel for the defendants in all other captioned cases) was unable to obtain authority to so stipulate on behalf of said defendants in Nos. 67–1555 and 67–1574, there being no representatives of said defendants known from whom such authority could be sought and obtained. The Court understands, however, that the issues presented in the aforesaid Stipulation and Submission in all other of the captioned cases would be also involved in Nos. 67–1555 and 67–1574 and that the issues suggested by (c), (d), (f) and (g)(2) of the above quoted reservation are also no longer issues in Nos. 67–1555 and 67–1574. Therefore, our aforesaid Opinion and this Supplemental Opinion would be controlling in said Nos. 67–1555 and 67–1574.

Accordingly, the Court has determined that judgment should be entered herein in favor of defendants and against the plaintiff dismissing at plaintiff's cost the complaints in each of the captioned causes.